OPINION
{¶ 1} Appellant, Jodee Bunce, n.k.a. Jodee Hulme, (hereinafter "Mother") appeals the judgment entry of the Lake County Court of Common Pleas, Juvenile Division, adopting the decision of the magistrate modifying the parties' shared parenting agreement. Pursuant to the modification, appellee, Richard W. Makuch, (hereinafter "Father"), was designated residential parent and legal custodian of the parties' minor *Page 2 
child for school purposes and the custody arrangement was changed to a "four day on, four day off" schedule. For the reasons set forth below, we affirm.
 {¶ 2} Mother and Father, while never married, gave birth to their son ("the child") on May 5, 2000. On January 29, 2001, the parties entered into a shared parenting plan which was adopted by the Juvenile Court. At the time, both parties lived in Lake County.
 {¶ 3} In general, the provisions of the plan are as follows: Mother would have legal custody and be designated the residential parent of the child. Father was designated the non-residential parent and awarded visitation on alternating weekends and one evening per week. The plan also provided that "when [m]other is working and [f]ather is on night shift, [f]ather shall have the first right to babysit for the minor child." Father was also given visitation for "[d]ays of [s]pecial [m]eaning", including Father's Day, Father's birthday, child's birthday on even numbered years, specified holidays, and two weeks of uninterrupted summer visitation. The plan stated that "[e]ach party shall have reasonable and liberal placement with the child and have the right to have the child with him or her at reasonable times and for reasonable durations by making prior arrangements with the other." The plan gave "equal control and supervision" over the child's care and guidance and required the parents to keep each other fully informed of the child's well-being. The plan prohibited each parent from acting in a manner that would "estrange the child from the other party nor in any way impair the child's love, affection, and regard for the other party."
 {¶ 4} On April 16, 2004, Father filed a motion to modify the foregoing custody arrangement in order to designate him the residential parent and legal custodian of the *Page 3 
child. Prior to Father filing the motion, the parties enjoyed a generally amicable relationship. The parties worked together pursuant to the shared parenting plan allowing for a liberal and flexible visitation schedule. However, after the motion was filed, cooperation between the parties ceased. While Mother did not specifically deny visitation, she limited Father's visitation to the minimum set forth in the plan. Mother testified she did so at the behest of her attorney but also stated her actions were a direct result of Father's attempt to obtain custody.
 {¶ 5} On May 12, 2004, Father filed a motion for psychological examination of the parties and the child which was conducted by Dr. Donald Jay Weinstein. Trial commenced on July 18, 2005, reconvened on December 15, 2005, and concluded on March 8, 2006. On July 6, 2006, the magistrate issued his decision designating Father residential parent and legal custodian for school purposes. The magistrate also modified custody to a "four day on, four day off" schedule. The remaining features of the original shared parenting plan were unchanged.
 {¶ 6} Both parties filed objections to the magistrate's decision. On January 3, 2007, the trial court issued its judgment entry overruling Mother's objections; alternatively, the trial court sustained Father's objections pertaining to the magistrate's failure to address the issue of child support. The matter was recommitted to the magistrate who, on March 19, 2007, determined "[t]he parties neither argued, requested, nor presented evidence regarding any modification of child support. The magistrate determines that there is not sufficient evidence in the record of the earnings of [Father] to address the child support issue." Accordingly, the magistrate concluded no further findings or recommendations were necessary. On March 29, 2007, the trial *Page 4 
court adopted the magistrate's July 6, 2006 and March 19, 2007 decisions. Mother now appeals and assigns two errors for our consideration:
 {¶ 7} "[1.] The [trial] court erred in modifying the shared parenting plan absent a true finding of change in circumstances.
 {¶ 8} "[2.] The court committed an abuse of discretion in modifying the residential parent and modifying the possession schedule of the parties. [Sic.]"
 {¶ 9} As Mother's assigned errors are interrelated, we shall address them together.
 {¶ 10} When reviewing an appeal from a trial court's decision to accept or reject a magistrate's decision, an appellate court must determine whether the trial court abused its discretion. In reRatliff, 11th Dist. Nos. 2001-P-0142 and 2001-P-0143, 2002-Ohio-6586, at ¶ 14. Where the court's decision is supported by a substantial amount of competent and credible evidence, the decision will not be reversed absent an abuse of discretion. Bates v. Bates (Dec. 7, 2001), 11th Dist. No. 2000-A-0058, 2001 Ohio App. LEXIS 5428, *8, citing Bechtol v.Bechtol (1990), 49 Ohio St.3d 21, 23. While a trial court's discretion in a custody proceeding is broad, it is not absolute, and the trial court must follow the procedure described in the applicable statute.Miller v. Miller (1988), 37 Ohio St.3d 71, 74.
 {¶ 11} R.C. 3109.04(E) sets forth the procedure for modifying a prior decree allocating parental rights and responsibilities for the care of children. In order to modify a prior decree, R.C. 3109.04(E)(1)(a) mandates a finding (1) of a change in circumstances; (2) that the modification is necessary to serve the best interest of the *Page 5 
child; and (3) that the harm resulting from the change will outweigh the benefits of not changing.
 {¶ 12} Mother's assignments of error challenge the trial court's conclusion that Father put forth sufficient evidence to justify a modification in the shared parenting plan. Mother first argues the trial court erred in finding a change in circumstances on which to premise the modification. In general, the phrase "change in circumstances" is intended "to denote an event[,] occurrence, or situation which has a material and adverse effect upon a child." Willoughby v. Masseria, 11th Dist. No. 2002-G-2437, 2003-Ohio-2368, at ¶ 22; see, also, Schiavone v.Antonelli (Dec. 10, 1993), 11th Dist. No. 92-T-4794, 1993 Ohio App. LEXIS 5891, *3. In determining whether a change of circumstances has occurred, the trial court has great latitude in considering all evidence before it. In re M.B., 2d Dist. No. 2006-CA-6, 2006-Ohio-3756, at ¶ 9, citing Wyss v. Wyss (1982), 3 Ohio App.3d 412, 420. The change, as contemplated by the Revised Code, must be "based upon facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree." R.C. 3109.04(E)(1)(a).
 {¶ 13} In his motion to terminate the shared parenting agreement, Father asserted that since the original order of January 29, 2001, Mother had failed to foster a positive relationship "not only between herself and child but between father and child." Father asserted Mother's alcohol consumption limits her ability to properly care for the child and her mental condition and "hampers her ability to maintain a stable, conflict-free home environment for the child." He also alleged Mother routinely called his home leaving irritable, rambling messages on his answering machine. *Page 6 
 {¶ 14} At trial, Father testified to several occasions in 2001 in which Mother became aggressive and hostile with him regarding the nature of the child's visitation. Specifically, Father testified (and Mother corroborated) that Mother forbade him from seeing the child if Patty (Father's then girlfriend and current wife) was with them. In relation to this issue, Patty Mackuch testified that between January 2001 and September 2002, her contact with Mother was tense and unpleasant. Mother's attitude was always one of "* * * anger, our answering machine's full of messages of her swearing, nasty. It's appalling, its [sic] intimidating, bashing my husband, bashing me, just calling us up drunk, calling message after message after message in a row to our home." Patty testified Mother referred to her as a "f***ing hippie", "f***ing bitch", and "old hag."
 {¶ 15} Father further testified that in July of 2001, Mother called Father from a bar to make arrangements to retrieve the child. Upon her arrival, Father stated Mother was intoxicated and so he refused to allow the child to go with Mother. Mother subsequently called the police who, upon arrival, recognized Mother's intoxication. The police explained that the child should stay with Father that night and Mother should not be driving in her condition. Mother's car was locked and her mother provided her a ride home.
 {¶ 16} Father also testified that, subsequent to the original order, Mother had damaged three of his household doors by way of slams, yanks, or kicks. Further, prior to April of 2004, Father testified Mother had made numerous "harassing" phone calls to his residence. *Page 7 
 {¶ 17} Notwithstanding these problems, evidence at the hearing established the parties cooperated reasonably well with the shared parenting plan and custody agreement prior to Father filing his motion to modify custody.[1] After the motion was filed, however, Mother became more overtly and more consistently hostile with Father. Father submitted multiple tape recordings of answering machine messages in which mother engaged in profanity laced harangues. The messages were often ad hominem attacks on Father, e.g., "You're the biggest a**hole I ever met in my entire life." Other messages involved threats relating to Mother's refusal to work with Father on issues pertaining to the child, e.g., "F*** you. I'm not working with you. No more leeway. That's it." Still others related to father's future relationship with the child, e.g., "Well, you know what, [the child] doesn't even f***ing miss you and like all the times I'm with him, he never says Daddy. He could give a sh** about you and you know what, my bottom line is like you f***ing taking me to Court because you're not seeing him from this day out and you can record this and you can play this for the Court because you know what, you're not seeing him." Mother also made statements about her willingness to comply with a court order, e.g., "And you listen motherf***er, you take me to f***ing Court because I got a lot to say to the Judge about you. Believe me, the Judge will side with me. If there's anything to say that gets awarded your f***ing way, I'd like to see you try to enforce it." All said, Mother admitted she had "probably" left "hundreds" of loud, cantankerous messages on Father's answering machine. *Page 8 
 {¶ 18} Although Mother testified Father and his wife were disrespectful and abusive to her, she failed to put forth any specific evidence of the alleged actions of which she complained. On May of 2004, Mother married her husband, Michael Hulme, after dating him for only three months. At the time of the hearing, the Hulmes resided in Thompson, in Geauga County. Mother testified she has had "four or five" jobs in the last five years. She further testified that she was fired from her most recent job, but is currently working out of the home for her husband's carpet cleaning business
 {¶ 19} Father testified he has worked swing shift at the same job for 17 years. In May of 2003, Father married Patty Makuch after the couple dated for some three years. The couple resides in the home Father has lived in for the last 15 years.
 {¶ 20} Dr. Donald Jay Weinstein, a psychologist who evaluated the parties, their home life, and their interaction with each other and the child also testified at the hearing. Dr. Weinstein stated, in his professional view, that Mother is "emotionally out of control." He emphasized his concern with Mother's histrionic outbursts and her impulsivity. Dr. Weinstein further asserted his belief that Mother's actions, in various ways, indicate an effort to alienate the child from Father. Dr. Weinstein testified that, during his home visit with Mother, she explained she was interested in sending the child to a school down the street from her home in Eastlake; that it would be the perfect school for the child and conveniently located for Father. However, Dr. Weinstein was dismayed to find out Mother was moving to Thompson several months later and that she intended to send the child to a new school system. Given the timeline, Dr. Weinstein's opined, Mother was aware of her move during the home visit but failed to disclose it in an effort to *Page 9 
remain the residential parent for school purposes. Dr. Weinstein also testified he believed that "alcohol is a theme involved in her life."
 {¶ 21} Alternatively, Dr. Weinstein testified Father is a passive personality with greater emotional, personal, and occupational stability. In light of his assessments of both parties and their households, Dr. Weinstein testified the child needs more consistency with visitation and that Father should become the residential parent for school purposes.
 {¶ 22} After considering the evidence presented, the magistrate concluded a change in circumstances had occurred since the original shared parenting plan was adopted. In his July 6, 2006 decision, the magistrate found that the parties had worked together pursuant to the shared parenting plan until April of 2004, when father filed his motion to modify custody. The magistrate pointed out that although no denial of visitation occurred after Father filed his motion, Mother "no longer viewed the shared parenting plan as a floor for parenting time, but rather as a ceiling." The magistrate found that even though Mother employed a flexible approach toward additional parenting time prior to Father filing the motion, she only permitted the minimum subsequent to the filing. The magistrate expressed concern over Mother's "harassing vitriolic rants against [Father]" and indicated that such behavior is negative for the child.
 {¶ 23} The magistrate gave significant credence to the testimony of Dr. Weinstein. In relation to this testimony, the magistrate found:
 {¶ 24} "Dr. Weinstein evaluated [Mother] as a person who is sometimes not in control [and] creates chaos around her. Since the original shared parenting plan, she has attempted suicide, she has married (Mr. Hulme), her mental health issues have *Page 10 
been treated by doctors through psychotropic drugs such as Clonopin [sic]. She has been diagnosed with mild depression. Dr. Weinstein concluded that her use of alcohol while taking the medications is of concern. He further concluded that her life is less stable than that of [Father].
 {¶ 25} "A major issue between the parties occurred regarding [the child's] schooling. [Mother] failed to inform the psychologist about a move to Thompson, leading Dr. Weinstein to believe that the child would be attending in Eastlake. The failure of information regarding the move put a strain on transportation for parenting time as well as leading to further vitriol between the parties. It also caused [Mother] to use her husband as the child transporter for parenting time. Dr. Weinstein opined that this arrangement should not continue. [Mother] must be involved in transportation as well as other parties and stepparents."
 {¶ 26} The foregoing findings were supported by testimony at the custody hearing or by way of exhibit. As a result of these findings the magistrate concluded:
 {¶ 27} "* * * the collapse of communication and extra parenting time beyond that provided in the shared parenting plan, the vitriolic rants, [Mother's] new marriage and utilizing Mr. Hulme as the sole transport for parenting time, and the use of alcohol while taking psychotropic medications are factors constituting a change of circumstances for purposes of reallocating parental rights."
 {¶ 28} We agree with the magistrate's conclusion.
 {¶ 29} After a review of the evidence submitted at trial, we do not believe the magistrate erred in drawing the foregoing conclusion. The testimony suggested the parties had a generally amicable relationship at the time the original shared parenting *Page 11 
plan was adopted; their relationship between 2001 and 2003, while not without tumult, was, in large part, reasonably stable as it related to custody and visitation. However, since April of 2004, the relationship has deteriorated to such an extent that the parties cannot speak to one another. The evidence at trial demonstrated Mother, through her acerbic and volatile behaviors, is, whether intentionally or inadvertently, interested in alienating the child from his father. In our view, this behavior has a material and adverse effect upon the child and, as such, there has been a change in circumstances. The trial court did not abuse its discretion in adopting the magistrate's decision as to this issue.
 {¶ 30} We shall next examine the trial court's best interest analysis. R.C. 3109.04(F)(1) sets forth various factors a court is required to consider when determining whether a modification in custody is in a child's best interests. In particular, the statute provides.:
 {¶ 31} "(a) The wishes of the child's parents regarding the child's care;
 {¶ 32} "(b) * * * [T]he wishes and concerns of the child * * *;
 {¶ 33} "(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
 {¶ 34} "(d) The child's adjustment to the child's home, school, and community;
 {¶ 35} "(e) The mental and physical health of all persons involved in the situation;
 {¶ 36} "(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights; *Page 12 
 {¶ 37} "(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;
 {¶ 38} "(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense * * *; * * * and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;
 {¶ 39} "(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;
 {¶ 40} "(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state."
 {¶ 41} Here, the magistrate modified the shared parenting agreement and, in so doing, declared Father the residential parent for school purposes. As a result, the magistrate changed the child's custody to "a four (4) day on, four (4) day off schedule * * *." While the magistrate did not formally list the statutory factors he considered in arriving at his conclusion that these modifications would be in the child's best interest, a practice we generally endorse, he carefully elucidated his reasoning. In doing so, we believe the magistrate met his statutory obligation.
 {¶ 42} In his best interest analysis, the magistrate underscored the import of stability within the child's living environment and its relevance to the child's success in school. The magistrate pointed out that, while Mother complied with the letter of the original shared parenting plan, after the underlying action was filed, she ignored its *Page 13 
spirit. The evidence demonstrated Mother threatened to withhold visitation from father due to the court proceedings. In his decision, the magistrate observed that "[Father] is the more stable parent. He has the more stable household. He is less likely to use the parenting time as a club and more likely to provide a non-chaotic environment, allowing the child to best succeed in school."
 {¶ 43} The magistrate emphasized that Mother is "a person who is sometimes not in control [and] creates chaos around her." The magistrate cited Mother's "vitriolic rants," her "mental health issues and instability," and "her use of alcohol while taking [psychotropic] medications" as foundations for his conclusion. The magistrate noted that the child has no medical problems and interacts well in both homes; however, the magistrate also found that he was unable to obtain a full picture of Mother's day-to-day lifestyle due to the evasive manner in which she and Mr. Hulme testified.
 {¶ 44} A review of his decision reveals the magistrate considered R.C.3109.04(F)(1)(c), (d), (e), and (f) in arriving at his ultimate decision that modification was in the best interests of the child. The record firmly supports the magistrate's evaluation and conclusion.
 {¶ 45} Lastly, in light of his "best interest" analysis, the magistrate concluded Father should be the residential parent for school purposes. In arriving at this conclusion, the magistrate properly complied with R.C. 3109.04(E)(1)(a)(iii) by finding that "any harm caused by the change in environment is outweighed by the advantages of the change of environment to the child."
 {¶ 46} In our view, the magistrate followed the proper statutory analysis in arriving at his various conclusions. His conclusions are supported by the record and *Page 14 
therefore withstand scrutiny on appeal. Accordingly, we hold the trial court did not abuse its discretion in adopting the magistrate's decision.
 {¶ 47} Notwithstanding the foregoing conclusion, Mother argues the trial court abused its discretion in modifying the original shared parenting plan because, at the time of the hearing, she (1) worked from home and remained a "full time Mother to [the child]" and (2) Father did not always "utilize either mid-week visitation or extended vacations due to his work schedule." While Mother's assertions are factually accurate, we do not believe these points render the trial court's adoption of the magistrate's decision arbitrary or unreasonable.
 {¶ 48} The concerns expressed by the magistrate in his decision were not necessarily premised upon the parties' occupational statuses. Rather, the magistrate's decision to modify the original plan was based more upon the evidence of Mother's emotional instability and mercurial disposition vis-à-vis Father and his relationship with the child. The advent of this volatility and antipathy was subsequent to Father filing his motion for custody and manifested itself in various ways: From disallowing Father to spend additional time with the child when Mother was unavailable (a practice formerly permitted) to her threatening, choleric phone tirades. As detailed above, this evidence, in conjunction with testimony regarding Father's personal stability, militate in favor of the magistrate's conclusion.
 {¶ 49} Furthermore, although Father works swing shift, there was abundant testimony that, were he awarded custody, he could permanently change his schedule to working third shift. Were Father to work third shift, testimony indicated Father would *Page 15 
take the child to school and, after school, Father could spend late afternoons and evenings with the child on those days he had custody.
 {¶ 50} We emphasize that a trial court has considerable discretion regarding whether it will adopt a magistrate's decision. We will reverse a trial court only where its decision is arbitrary, unreasonable, or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. Under the circumstances of this case, Mother's points pertaining to each party's relative occupational status are insufficient to merit a reversal of the trial court's judgment.
 {¶ 51} Appellant's two assignments of error lack merit.
 {¶ 52} Therefore, for the reasons discussed above, the decision of the Lake County Court of Common Pleas, Juvenile Division, is affirmed.
DIANE V. GRENDELL, J., MARY JANE TRAPP, J., concur.
[1] It is worth noting that much of the evidence considered by the magistrate and trial court was based upon occurrences which followed Father's filing of his motion. However, as indicated above, the change in circumstance analysis is based upon facts that have arisen since the original decree. Thus, evidence of developments that occur after the motion was filed may be considered by the court in its determination whether circumstances have changed. To hold otherwise "would be contrary to the pole star of all child custody hearings, i.e., the best interest of the child." Carruthers v. Carruther (July 24, 1979), 5th Dist. No. 9-CA-79, 1979 Ohio App. LEXIS 9297, *5. *Page 1